James R. LITTLE, M.D., Appellant (Defendant),

v.

Michael Robert KOBOS, a minor child two years of age, by and through Michael KOBOS and Rebecca Kobos, his parents and next friends, Appellee (Plaintiff).

No. 93–125.

Supreme Court of Wyoming.

July 14, 1994.

Carl L. Lathrop and Corinne E. Rutledge of Lathrop & Rutledge, P.C., Cheyenne, for appellant.

Lawrence B. Hartnett, Jackson, Maureen T. Donohoue, Lander, John R. Hursh of Central Wyoming Law Associates, P.C., Riverton, and Andrew S. Hartnett, Honolulu, HI, for appellee.

Before THOMAS, MACY and TAYLOR, JJ., and BROWN and CARDINE, JJ., retired.

MACY, Justice.

Appellant James R. Little, M.D., appeals from the district court's order which found that his motion for a directed verdict should be denied and which granted a judgment on the jury verdict in favor of Appellee Michael Robert Kobos and from the trial court's order which denied his motion for a new trial.

We affirm.

Dr. Little states the issues on appeal as follows:

I. Trial court should have granted Appellant's motion for new trial on grounds that Appellee's only expert witness on Appellant's liability committe[d] perjury on material matters.

II. The trial court erred as a matter of law in directing a verdict for Dr. Pockat to the detriment of Dr. Little.

III. The court abused its discretion when it ordered the change of venue to Lander three days before the scheduled trial and before the Jackson panel of 75 persons was scheduled for voir dire by the parties.

IV. It was error for the court to instruct the jury that they could award plaintiff Michael Kobos damages for future lost earnings because there was no competent evidence to support such instructions.

This medical malpractice case is before us for the third time. First, we ruled that the plaintiffs' motion to change the trial judge should not be granted. *Kobos by and through Kobos v. Sugden*, 694 P.2d 110 (Wyo. 1985) (*Kobos I*). Second, we reversed and remanded the case for a new trial when the plaintiffs appealed from a jury verdict in favor of four of the defendants and from directed verdicts for all the defendants. *Kobos by and through Kobos v. Everts*, 768 P.2d 534 (Wyo.1989) (*Kobos II*). Now, we are asked to review orders which were entered at the conclusion of the second trial.

In 1981, when Kobos was a year old, he began to experience pain in his right hip. Dr. Little and Thomas Pockat, M.D., initially treated him. Eventually, Kobos was diagnosed as having chronic osteomyelitis (infected bone). In *Kobos II*, which was decided in 1989, we stated: "As a result of either a developmental infected bone condition or surgical misadventure ..., growth plate damage resulted to the femur which will bring about significant future hip growth and use problems for the child." 768 P.2d at 536. [1]

Kobos was approximately twelve years old when the second trial was held in 1992. At that time, his right leg was a little more than one inch shorter than his left leg. Kobos's treating physician believes that, because of

1. For a more extensive review of the underlying facts in this case, see *Kobos II*, 768 P.2d at 536.

the back discomfort which occurs when one leg is an inch or more shorter than the other leg, a surgical procedure will probably have to be performed on Kobos in order to equalize the lengths of his legs. Additionally, the treating physician anticipates that Kobos will develop arthritis in his right hip when he is between forty and sixty years old. If that were to occur, a total hip replacement would probably be necessary to correct the problem.

Kobos's parents asserted their own claims in the first trial against the defendants, but they dropped those claims before the second trial began. Five physicians were named as the defendants for the first trial. Only two of the original defendants, Dr. Little and Dr. Pockat, were named as the defendants when the case was tried the second time. Kobos voluntarily dismissed the other defendants.

The jury returned a $750,000 verdict in favor of Kobos at the conclusion of the second trial. It apportioned the negligence between the defendants as follows: seventy-five percent to Dr. Little and twenty-five percent to Dr. Pockat. After the jury had returned its verdict but before a judgment had been entered, the trial court granted Dr. Pockat's motion for a directed verdict and denied Dr. Little's motion for a directed verdict. The trial court entered a judgment and, subsequently, denied Dr. Little's motion for a new trial. This appeal followed.

2. W.R.C.P. 60(b)(3) provides:

   (b) *Other reasons.*—On motion, and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: ... (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party[.]

3. W.R.C.P. 59(a) provides:

   (a) *Grounds.*—A new trial may be granted to all or any of the parties, and on all or part of the issues. On a motion for a new trial in an action tried without a jury, the court may open the judgment, if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment. Subject to the provisions of Rule 61, a new trial may be granted for any of the following causes:

## Perjury

Dr. Little contends that the only expert witness who was called by Kobos to establish liability testified falsely on material matters and that this allegedly perjured testimony "so tainted the well of justice" that a new trial must be had for justice to be served.

■ Perjury may justify relief under W.R.C.P. 60(b)(3).[2] *Harduvel v. General Dynamics Corp.,* 801 F.Supp. 597, 607–12 (M.D.Fla.1992). Similarly, a new trial may be warranted under W.R.C.P. 59 because of an irregularity in the proceedings or an abuse of discretion which deprived a party of a fair trial or because of misconduct by the prevailing party.[3] We review the trial court's decision by applying the abuse-of-discretion standard. *Halliburton Company v. Claypoole,* 868 P.2d 252, 257 (Wyo.1994); *Vanasse v. Ramsay,* 847 P.2d 993, 996 (Wyo. 1993). Judicial discretion is

   "a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously."

*Martin v. State,* 720 P.2d 894, 897 (Wyo. 1986). . . .

      .      .      .      .      .

   " 'Judicial discretion is necessarily broad—but it is not absolute. Abuse occurs when a material factor deserving

   (1) Irregularity in the proceedings of the court, jury, referee, master or prevailing party, or any order of the court or referee, or abuse of discretion, by which the party was prevented from having a fair trial;
   (2) Misconduct of the jury or prevailing party;
   (3) Accident or surprise, which ordinary prudence could not have guarded against;
   (4) Excessive damages appearing to have been given under the influence of passion or prejudice;
   (5) Error in the assessment of the amount of recovery, whether too large or too small;
   (6) That the verdict, report or decision is not sustained by sufficient evidence or is contrary to law;
   (7) Newly discovered evidence, material for the party applying, which the party could not, with reasonable diligence, have discovered and produced at the trial;
   (8) Error of law occurring at the trial.

significant weight is ignored, when an improper factor is relied upon, or when all proper and no improper factors are assessed, but the court makes a serious mistake in weighing them.'"

*Coon [v. Grenier],* 867 F.2d [73,] 78 [ (1st Cir.1989) ] (quoting *Independent Oil & Chem. Workers v. Procter & Gamble Mfg.,* 864 F.2d 927, 929 (1st Cir.1988)).... 847 P.2d at 996.

■ Dr. Little cites numerous examples of this supposedly perjured testimony. The thrust of his argument is that Kobos called only one expert witness to establish: (1) the standard of care which was applicable to the doctors; (2) that the doctors failed to meet the standard of care; and (3) that such failure caused Kobos's damages. According to Dr. Little, the expert erroneously relied upon another patient's medical records in reaching his conclusions about Dr. Little's care and treatment of Kobos, and, when the expert was confronted with his mistake, he lied by saying that he did not rely upon those records in forming his conclusions.

Where fraud [or] misrepresentation is relied upon as a ground for relief sought pursuant to a Rule 60(b) motion, it must be proved by clear and convincing evidence. Fraud is never presumed, and the burden of proof to clearly establish such fraud or misrepresentation is upon the party seeking relief.

*Stevens v. Murphy,* 680 P.2d 78, 79 (Wyo. 1984). Under this standard, the movant must establish perjury by clear and convincing evidence. *Harduvel,* 801 F.Supp. at 607 & 610.

■ After having carefully reviewed the expert's testimony in this case, the trial court was not convinced that the expert had perjured himself. The trial judge stated that Dr. Little "failed to prove that [the expert's] trial testimony was anything more than mistake or confusion." We agree. The trial court did not abuse its discretion.

The expert testified in his deposition about the care which the doctors had given to Kobos. Kobos's attorneys provided the expert with medical records for his review prior to his deposition being taken. In his deposi-

tion, the expert identified thirty-five pages of medical records as being of greater importance to his conclusions than the other pages were. Of those thirty-five pages, thirteen pages were records which pertained to another patient who had experienced symptoms similar to those which Kobos experienced during approximately the same time.

The expert was questioned throughout his deposition about the course of Kobos's disease and the treatment the doctors provided. The expert was asked to identify the records which he relied upon in formulating his understanding of the case and in reaching his conclusions. On several occasions, the expert referred to the other patient's records without explaining that the records did not belong to Kobos.

The defendants attempted to use the deposition at trial to impeach the expert by showing the jury that the expert's conclusions were unreasonable because they were reached on the basis of another patient's medical records. However, the expert testified that he knew the records belonged to another patient, and he denied that he had erroneously relied upon the other patient's records in reaching his conclusions about Kobos's care and treatment.

Dr. Little points to several of these inconsistencies in his argument that the expert committed perjury. Dr. Little does not, however, carry his burden of showing by clear and convincing evidence that the expert perjured himself. Instead, the expert's testimony, when it is considered as a whole, indicates that he was mistaken or confused. When the expert testified at trial, he indicated several times that he had been confused or mistaken or had misunderstood the question. The defendants did an excellent job of cross-examining and impeaching the witness. They effectively pointed out to the jury that the expert's testimony contained inconsistencies. These inconsistencies did not, however, rise to the level of being perjury.

"[T]estimonial error is not necessarily tantamount to testimonial misconduct." *Harduvel,* 801 F.Supp. at 612. A witness is not guilty of perjury simply because his testimony is inconsistent. Cross-examination is the proper method to be used in ferreting out

such inconsistencies. "Internal inconsistencies in the testimony or insufficient foundation for the basis of the expert's opinion, for example, may provide sufficient contradiction to allow the jury to disregard the opinion rendered." *RYN, Inc. v. Platte County Memorial Hospital Board of Trustees,* 842 P.2d 1084, 1087 (Wyo.1992). The trial court instructed the jury that it could disregard any testimony from the expert witness which it felt was unreasonable.

■ Dr. Little did not present any new evidence with his motion for a new trial. His entire motion involved a review of the testimony which had been elicited and examined in the expert's pretrial deposition and during the lengthy trial. As we stated in *Stevens:*

> Appellant feels the result of the trial was wrong. Unsuccessful litigants often harbor these feelings. On this motion, appellant attempts to retry the case, relitigate the controversy, and asks the court to set aside its judgment and determine the controversy in his favor.

> In this effort appellant must fail, for he has not established fraud by clear and convincing evidence. Here appellant presents nothing new.... [T]he granting of such relief generally depends upon the occurrence of later events or requires a showing of something that was unknown or not before the court originally.

680 P.2d at 80.

Dr. Little did not meet his burden of showing perjury by clear and convincing evidence. The trial court did not abuse its discretion by denying Dr. Little's motion for a new trial.

### Directed Verdict in Favor of Dr. Pockat

■ Dr. Little argues that the trial court erred by directing a verdict in favor of Dr. Pockat. He contends: "[T]here was sufficient evidence to go to the jury on the issue of whether Dr. Pockat breached the standard of care applicable to him by failing to properly diagnose and treat [Kobos]." The cause of action in this case accrued in 1981 while the doctrine of joint and several liability still applied in negligence actions. Dr. Little argues that the trial court's decision to direct a verdict in favor of Dr. Pockat impermissibly foreclosed his right to seek contribution from Dr. Pockat.

We cannot review the trial court's decision on this issue. Dr. Little directly challenges the judgment rendered in favor of Dr. Pockat; however, he failed to perfect an appeal regarding this issue.

Dr. Little's notice of appeal identified two orders from which he took his appeal: (1) the Judgment on Jury Verdict; and (2) the Order Denying Defendant Little's Motion for a New Trial. Dr. Little did not specify that he was appealing from the Order Dismissing Thomas Pockat, M.D. W.R.A.P. 2.07(a)(2) requires that the notice of appeal must "[i]dentify the judgment or appealable order, or designated portion appealed."

Although the certificate of service indicated that Dr. Little served the notice of appeal on Dr. Pockat, Dr. Little did not serve Dr. Pockat with copies of his brief or his designation of the record. The rules of appellate procedure require that the appellant serve the opposing parties with copies of his brief and the designation of the record. W.R.A.P. 3.05(b) and 7.06(a). Pursuant to W.R.A.P. 1.03, we may refuse to consider the offending party's contentions on appeal when he fails to comply with the rules of appellate procedure.

In *First National Bank of Thermopolis v. Bonham,* 559 P.2d 42 (Wyo.1977), we held: "[A]ll parties in interest must be given an opportunity to be heard before the court will or can proceed to a decision upon the merits of the case." 559 P.2d at 50. Although *Bonham* was decided before the Wyoming Rules of Appellate Procedure [4] were adopted and was an appeal from an administrative agency decision, the underlying principles apply in this case. *See DS v. Department of Public Assistance and Social Services (Parental Rights to X, Y & Z),* 607 P.2d 911, 915 (Wyo.1980).

Dr. Little states that he "is not trying to prosecute this appeal as to Dr. Pockat." He contends that he is only seeking a new trial as between Kobos and himself and that he

---

4. The Wyoming Rules of Appellate Procedure became effective on August 1, 1978. Prior to that date, W.R.C.P. 72 through 76 governed civil appeals.

does not seek to adversely affect Dr. Pockat's rights.

Dr. Little suggests the impossible. Dr. Pockat's interests would necessarily be affected by a decision ordering that the directed verdict in his favor was improper. The directed verdict exonerated Dr. Pockat as a matter of law from any negligence in the case. Deciding that the directed verdict was improper would again, at the very least, bring Dr. Pockat's professional reputation into question. Dr. Pockat had no way of knowing that Dr. Little was contesting the trial judge's ruling which directed a verdict in his favor. He was entitled to defend that decision. Because Dr. Pockat's interests were not represented on appeal, we cannot reach the merits of this issue.

## Change of Venue

■ In August 1990, Kobos filed a motion for a change of venue. After holding a hearing, the trial court denied the motion and stated that it would call seventy-five jurors for selection in Jackson. The trial court also directed the Lander clerk to call fifty jurors in Lander on a standby basis who would be available in the event that an impartial jury could not be chosen in Jackson. The trial court ruled that Kobos could draft a questionnaire to be circulated to the prospective Jackson jurors prior to the trial.

Kobos filed a continuing motion for a change of venue on September 4, 1992. On September 10, 1992, the trial court ordered that, "because of the very serious venue question extant in this case," the questionnaire be submitted to the jury panel. The trial court took Kobos's continuing motion for a change of venue under advisement pending receipt of the jurors' responses to the questionnaire.

The trial court held a hearing on the motion on September 25, 1992. After the trial court reviewed the motion and the defendants' responses, heard counsel's arguments, and considered the juror questionnaire responses, it granted the motion for a change of venue. The trial commenced in Lander on September 30, 1992.

W.R.C.P. 40.1(a) governs changes of venue in civil trials:

(a) *Transfer of trial.*

(1) The court upon motion of any party made within 15 days after the last pleading is filed shall transfer the action to another county for trial if the court is satisfied that there exists within the county where the action is pending such prejudice against the party or the party's cause that the party cannot obtain a fair and impartial trial, or that the convenience of witnesses would be promoted thereby....

.   .   .   .   .

(3) The presiding judge may at any time upon the judge's own motion order a transfer of trial when it appears that the ends of justice would be promoted thereby.

"Rule 40.1 obviously vests considerable discretion in the trial court." *Atlas Construction Company v. Slater,* 746 P.2d 352, 354 (Wyo.1987). We will disturb a trial court's decision on a motion for a change of venue only when an abuse of discretion has been shown. *See id.*

Kobos moved for a change of venue, claiming that the Jackson community was generally aware of the case and that local prejudice had resulted from the first trial. Dr. Little argues that he was entitled to attempt to seat an impartial jury in Jackson through the voir dire process. W.R.C.P. 40.1(a) does not expressly require that the trial court allow the parties to conduct voir dire before it grants a motion for a change of venue.

Dr. Little argues that, under the rationale of *Murry v. State,* 713 P.2d 202 (Wyo.1986), voir dire to determine whether the jurors are actually prejudiced is required before a change of venue can be ordered. In *Murry,* we stated:

It is the burden of the defendant to show prejudice so great that a fair trial cannot be obtained, and the defendant must show actual prejudice in the minds of jurors. Because of this, the motion for a change of venue cannot be logically passed on until the extent of prejudice, if any, is determined upon voir dire examination.

"The ultimate test of the propriety of a change of venue is what is revealed in voir dire of the jury panel."

713 P.2d at 208 (quoting *Shaffer v. State,* 640 P.2d 88, 103 (Wyo.1982)) (citations omitted). *Murry* is not directly in point. That case was a criminal case, and the motion for a transfer was governed by the rules of criminal procedure, which were similar but were not identical to W.R.C.P. 40.1(a).[5] Specifically, the rules of criminal procedure did not contain a provision comparable to W.R.C.P. 40.1(a)(3) which would have allowed a trial judge to transfer a trial when it appeared that the transfer would have promoted the ends of justice.

Our decision in *Atlas Construction Company,* which was decided almost two years after *Murry* was decided, made it clear that, under the rules of civil procedure, voir dire was not required before a change of venue could be ordered. In *Atlas Construction Company,* we stated:

> Rule 40.1 contains no requirement that the court may rely only upon sworn testimony in determining whether to transfer a trial. The court properly relied upon information contained in the jointly filed motion, witness lists on file, and arguments of counsel [in deciding whether to grant a motion for a change of venue].

746 P.2d at 354. We will not disturb a trial judge's decision on a motion for a change of venue when the decision is not arbitrary or capricious and when it has been made using objective criteria. *See id.*

5. *Murry* was decided in 1986. At that time, W.R.Cr.P. 23 governed the transfer of a criminal trial. The revised rules of criminal procedure became effective in 1992. Currently, W.R.Cr.P. 21 pertains to changes of venue for criminal trials. W.R.Cr.P. 21 is somewhat different from former W.R.Cr.P. 23, but the procedure for transferring a criminal trial is the same under both rules.

6. The record on appeal contains more than sixty-five juror responses. We have no way of knowing which sixty-five responses the trial judge reviewed before she made her determination. However, Dr. Little does not dispute the trial court's statistical analysis of the responses; he disputes only the effect of the responses. We will, therefore, use the trial judge's figures in deciding whether she abused her discretion by granting Kobos's motion for a change of venue.

■ In this case, the trial judge reviewed the fairly extensive publicity which surrounded the first trial. She also considered counsel's arguments and the juror questionnaire responses. When she made her determination on the venue question, the trial judge had received juror questionnaire responses from sixty-five of the seventy-five prospective jurors.[6]

At least ten of those sixty-five prospective jurors had opinions about the parties or the proper result of the case or had attended the first trial, and they would, therefore, probably be subject to immediate excusal. Forty prospective jurors had heard something about the case. All but five jurors knew some of or all of the doctors who were the defendants or who would be called as witnesses in the case. Two-thirds of the prospective jurors were friends of or had worked for at least one of the doctors.

The trial judge did not abuse her discretion by ordering the change of venue. The evidence indicated that local prejudice would have interfered with Kobos's right to obtain a fair and impartial trial. The trial court's ruling served to promote justice.

## Damages

Dr. Little contends that the trial court erred by instructing the jury, over his objection, that it could award damages to Kobos for future lost earnings. The doctor argues that Kobos did not present any competent evidence to support the instructions.[7]

7. Instruction No. 9 read:
   Regardless of how you decide on the question of liability, you must then fix the amount of money which will reasonably and fairly compensate plaintiff for those elements of damage proven by the evidence to have been caused by the negligence of the defendants, taking into consideration the nature, extent and duration of the injury.
   The claimed elements of damage are:
   (a) The physical and mental pain and suffering experienced as a result of the injuries and that reasonably certain to be experienced in the future.
   (b) Disability.
   (c) Loss of enjoyment of life and any loss of enjoyment of life reasonably certain to be experienced in the future. The award for this specific element should not duplicate the award given for any other element of damage.

In reviewing a trial court's determination concerning jury instructions, we employ the following standard of review:

"[A] finding of error is not alone sufficient to reverse; prejudicial error must be found. Prejudicial error is never presumed; it must be established by the parties. If it is established that an instruction or instructions had a tendency to confuse or mislead the jury with respect to the applicable principles of law, reversal is proper."

*Bigley v. Craven,* 769 P.2d 892, 895 (Wyo. 1989) (quoting *Cervelli v. Graves,* 661 P.2d 1032, 1036 (Wyo.1983) (citations omitted)). *See also L.U. Sheep Company v. Board of County Commissioners of County of Hot Springs,* 790 P.2d 663, 672 (Wyo.1990). Applying this standard, we must first determine whether the instructions were given in error and, if so, whether that error was prejudicial. *Bigley,* 769 P.2d at 895.

■ In this case, Dr. Little contends that the trial court erred in giving the instructions because Kobos failed to present any competent evidence which indicated that the amount of his potential future earnings would be diminished. " '[A] party is entitled to have a jury instruction upon its theory of the case but only if such theory is supported by competent evidence and a proper request for the instruction is made.' " *Bigley,* 769 P.2d at 894 (quoting *Short v. Spring Creek Ranch, Inc.,* 731 P.2d 1195, 1199 (Wyo.1987)).

Kobos called Helen Woodard, a vocational rehabilitation expert, to testify at trial. Woodard testified that she had discussed Kobos's physical limitations which were caused by the damage to his hip with Dr. Lewallen, Kobos's treating physician at the time of the second trial. The doctor had indicated to her that Kobos would probably have to avoid jobs which would require standing or walking for most of the day, heavy lifting, repeated lifting, or weighted lifting while he was twisting his body. Dr. Lewallen also told Woodard that Kobos's legs were different lengths, and they discussed the possibility that Kobos will develop arthritis in the future.

Woodard concluded that, because of these physical limitations, Kobos will be classified as a "disabled worker in the labor force." Woodard indicated that "disabled worker in the labor force" was a term of art which was used to refer to "a person who ha[d] limitations that preclude[d] [him] from doing the kind or amount of work [he] would have otherwise been able to do." Woodard then testified about her recommendations for Kobos. She indicated that he will need to secure a job where he has good control over his work environment so that he may change his physical position at his discretion. Woodard concluded that Kobos will also need to avoid jobs which are essentially physical in nature and that he will, therefore, need to obtain education beyond the high school level.

Kobos also called an economist who testified about the economic consequences of Kobos's disability given Woodard's conclusion that Kobos will be classified as a "disabled worker in the labor force." The economist computed the value of Kobos's future lost earnings damages.

Dr. Little argues that Dr. Lewallen's deposition refutes and contradicts Woodard's determination that Kobos will be a "disabled worker in the labor force." Dr. Lewallen testified in his deposition as follows:

Q As far as the femur is concerned, the big leg bone, I like to call it, if you have either one of these two procedures [to

(d) Loss of earnings. The present cash value of any earnings reasonably certain to be lost in the future.

(e) Medical expenses. The reasonable expense of necessary medical care, treatment, and services received to date, and any medical expense reasonably certain to be incurred in the future.

Whether any of these elements have been proven is for you to determine.

Instruction No. 10 read:

There is no formula the court can give you for the determination of damage for pain and suffering, loss of enjoyment of life, disability, or any future damages which may be reasonably certain to arise. It is not necessary that any witness shall have expressed any opinion as to the dollar amount of damages therefor. Your award, if any, should be such sum as will fairly and adequately compensate the plaintiff. The amount awarded, if any, rests within your sound discretion and is for you to determine, taking into consideration all the evidence in this case from your knowledge, observation and experience in life. Your award, if any, should be for what damages are reasonable and just.

equalize leg lengths], is there any disability that attaches to a person that's had either one or the other of these procedures for the rest of his life?

A  Not, not that one would notice, no.

Q  All right.

A  I wouldn't expect there to be any.

Dr. Little also argues that the following testimony by Dr. Lewallen concerning the possibility that Kobos will need to have a total hip replacement sometime when he is between the ages of forty and sixty years because of arthritis in his hip refutes Woodard's conclusion that Kobos will be a "disabled worker in the labor force":

And basically with a total hip replacement, you take the femoral head out and you replace it with a ball that fits on a stem that fits down inside the bone.  And then usually the socket is also reamed and you place a metal cup in there that has some type of liner that fits with the ball that takes the place of this femoral head.  And that takes care of the arthritis and gets rid of the discomfort so he can have *a reasonably normal life without pain when he walks* and—

(Emphasis added.)  Dr. Little concludes that, since Woodard's conclusions were made on the basis of her discussions with Dr. Lewal-len about Kobos's physical limitations, Woodard's and the economist's testimony was insufficient to support the instruction on future lost earnings damages.

Dr. Little's argument takes Dr. Lewallen's testimony out of context and rests upon the erroneous assumption that disability in the medical sense is synonymous with disability which affects one's ability to work.  Dr. Lewallen was not questioned in his deposition about Kobos's physical limitations with regard to his future ability to work.  Woodard's testimony concerning the conversation which she had with Dr. Lewallen about Kobos's physical limitations associated with his future employment was not refuted.

Woodard's and the economist's testimony supported the trial court's decision to instruct the jury on awarding damages for Kobos's future lost earnings.  The trial court did not err by giving the jury instructions.

Affirmed.